Good afternoon. Why don't you wait until council gets settled in. Yes, sir. All right. I'd like to stay three minutes in your bubble. You have to watch the clock. I know. I'm Walter Boyacki. I'm here from El Paso, Texas. I represent a bunch of Ecuadorian fishermen who were sailing, minding their own business, out in the Pacific, about 300 miles out in international waters, kind of close to the Galapagos Islands, but not really close. They had a catch of tuna, and they had been out for a number of days when their boat, Commander Tobar, renamed the plaintiff's boat, and all the fishermen were seized by the U.S. Navy and the U.S. Coast Guard on the suspicion of having drugs on their boat. They didn't find any drugs on their boat, and they decided that since they didn't find any, they would load that boat back to Manta, Ecuador, and see if they could find some more drugs on the boat, or perhaps on the fishermen. Counsel, we're familiar with the facts. I have a question about the Public Vessels Act and the issue of Ecuadorian law. There's nothing in the record to suggest that in Ecuador, people who are similarly situated can sue the government, which is the question here. Do you read the record differently? Is there anything in this record that suggests that there's a reciprocal right of an American fisherman to sue the government of Ecuador? Your Honor, if you read the affidavit by the Ecuadorian lawyer, apparently the Constitution in Ecuador is an open-courts Constitution, and everyone has that right, including the government. Well, I didn't understand it to say that. I understood it to say that whatever rights to sue local people have, so do foreigners. But it sort of leaves blank, in my mind, who has the right to sue the government and under what circumstances, which is a different question. Correct. Your Honor, the difficulty I had in this case, and to steal something the Court said earlier, if you diagram this case, what we had to do was, we got this indemnification letter from the U.S. government and the agency, from the embassy, saying that if you lose any of your fish, or if we damage you in any way, we will make it good. So if we diagram this thing, that's the target. That's what's sitting in the middle. And what we're doing then is trying to figure out how we're going to get there. So do we do it under pleading for public vessels? Well, it may not be possible. I mean, it is possible that there's a promise that can't be fulfilled. And, Judge, I agree with you 100%. If they had let me do discovery in this case, we might have come to that absolute conclusion there was nowhere to go. Well, what discovery would enable you to determine what? What did you need discovery about that would have changed the outcome here? Well, Your Honor, in this particular case, if you looked at the letter from the embassy, okay, question, who authorized that? Second question, had they paid these claims before? If they were routinely paying claims where they stopped these innocent people and ruined their livelihood for however many months, how and under what basis did they pay it? Did they pay it under the Attorney General's Statute 21, whatever it is, whereby if law enforcement seizes foreign claims in a foreign country that they can pay it? That's one way. Is it an Alien Claims Act? Is it? That I didn't know. Is it under the Federal Tort Claims Act under the Hedgehead? Because we could have found out all of these decisions were made in Washington. They weren't made on the boat. Was it a Public Vessels Act? What was required for the Public Vessels Act and the reciprocity of the Ecuadorian? Well, as I understand our cases, the relevant cases, if something falls within the Public Vessels Act, that's the only place that you get to go, which takes us right back to the question of Ecuadorian law. And I just saw nothing in the record that would allow us to say that there's a reciprocal right. Well, I disagree with the court in the sense that if, in fact, you have an open court's constitution and the constitution is as open as Ecuador is, I didn't know if, at that point, if you're suing under this so-called contract, is it a contract between the Ecuadorian government and the U.S. government? Versus then, my people were not Ecuadorian military. My people were civilians. So how, then, does that apply if, in fact, you're trying to get into an Ecuadorian court? Well, the question is, can people sue the Ecuadorian government for a similar wrong? That's the reciprocal question, and there's no answer here. Yes, and the reason I, and it's probably more my fault than anything else, I understood it can be, or what the court was writing was, can the United States or can a U.S. citizen sue an Ecuadorian court? No, can they sue the Ecuadorian government? Because that's what you're doing here. You're suing the government. So for it to be reciprocal, an American citizen would have to be able to sue not just an Ecuadorian company or person. They clearly can do that from these materials, but the government. And it says they can sue an Ecuadorian person, company, or entity, but it says nothing about the government. Well, that's true, and I think, like I said, there's nothing else that's on me because I thought the entity included the Ecuadorian government, and in this particular case, see, had we had any type of discovery whatsoever, some of these questions could have been asked and answered. But when I'm whipsawed into I can't take a single deposition, I get a 12B1 motion that should be a Rule 56 motion where I can respond with affidavits and whatever, which under 12B1, as the court knows, I can't. I have to then try and put this case together. It was absolutely impossible. I couldn't take even the deposition of the people who, one, wrote the letter for the embassy and was the same person who filed one of the affidavits on the 12B1 saying there was no jurisdiction. So what I was trying to do, can I take this guy's deposition and find out what the deal was with the Ecuadorian government? If, in fact, there was an agreement, is there agreement then to allow us into Ecuadorian court? I did not know the answer to that. Had I had the opportunity to get somebody's deposition here, I might have been able to find that out. Then if, in fact, it was a headshed potential case that under the Federal Tort Claims Act, and you know how the Federal Tort Claims Act kind of by osmosis goes into the admiralty statute. See, then I thought, well, maybe there's an opportunity to go there. How then do we interpret the contract again? How then under the Alien Act, the Alien Tort, how do you interpret that? So in other words, I'm working with this contract. Can I find out who wrote it? What does it mean? What was the agreement of the parties here? Now, we then know we have the 25 fishermen who are holding the smelly fish here that are there. And they lost their entire catch. And there's nowhere for them to go. No one will pay them, despite the United States saying we'll pay you. So to show the court, I was watching Admiral Mullen, the chairman of Joint Chiefs of Staff on TV the other day. He was talking about how they were doing in No Ask, No Tell. And they were asking, what is your feeling on that? And he said the important thing to him was integrity, the integrity of the people. And it's just like Judge said before, what does the United States stand for? The United States says I'm going to pay you if we ruin your catch. Can we go under international law? I think you can. Can you go under the contract? I think you can. So it wasn't necessarily stuck with Public Vessel Act. There may have been some place for me to go had I had the opportunity to ask somebody, how did you get there? How did you get there from here? And if I'm cut off from asking even the people who signed the affidavits, I couldn't ask them any questions. And the interesting part was they were all here. So discovery would not have been expensive. Discovery would not have been difficult. And we should have accomplished it. And the court may be 100% correct. And they said, we don't have it. There's no place else to go here. Now, I think it's offensive that the United States says we're going to pay you. And they don't. I think that's terrible. And to tell you the truth, trying to explain that to a bunch of Ecuadorian fishermen was kind of embarrassing. But I think that's maybe all we could do. Now, the court knows from my brief, there's a bunch of cases, particularly out of here, which say you need to, before you throw somebody out jurisdictionally or whatever, you need to get some facts first. Because otherwise, you're cutting off the plaintiffs here. And that's what they did. So we had under 12B, which I thought was fascinating, they agreed to answer their interrogators. Never did. Agreed to answer discovery, never did. We tried to take depositions, won't do it. They filed a 12B1, we can't take anybody's deposition. Where are we going? What is the problem here? If, in fact, they did it, they're responsible for it, they said they would pay it, I know for myself, if I told somebody that, I'm stuck paying it. If an insurance company told them that, they're stuck paying it. If you won't tell somebody that, you're stuck paying it. But we need the facts. And the circuit ball here in the Ninth Circuit is you need to get some facts, the Augustine case, Thornhill case, jurisdictionally, the facts may be intertwined here. And if it turns out they were no good, they were no good. But at least give me the opportunity to find the facts, Judge, because I can't. I can't even take the deposition of the guy who wrote the letter. There was nowhere for me to go. So, we get pitched on this thing. No discovery, despite the fact that they agreed to do discovery. We don't get any. And the judge then says, interesting enough, in his order, on page 7 of his order, he says, there's no controverting affidavits. How do we get them from the same people that were writing the orders? That were taking the boat away from the Ecuadorians. So, with all due respect to the court, I would have, and I would ask that the court do that, is give me the opportunity to take some of the depositions as the court has held in the past, because they went in and tried to defend on discretionary function as well. So, if in fact discretionary function, which I don't think has any application in a law enforcement situation, I think I could approve it. I think I could approve the negligence here. They didn't even have probable cause, much less a reason to tow these guys for nine days. They didn't have anything. And if the court would give me the opportunity to show the negligence, the lack of probable cause, the aliens, their rights, the contract, how this contract exists, who got paid, who didn't get paid, then we'd have a different case. And what they did here was they said, get out of here. Maybe we should hear next from the government. Dave, if you wanted to save your time. I'll save my time, yes. Thank you. Thank you, Your Honor. I'm Scott Glaze, former defendant of the United States. As there's been a problem with me all during this case, I, hard as I try, I'm just incapable to understand exactly what it is that plaintiffs have been arguing. Well, it may be hard to understand. If there are no drugs on board and there are damages or losses sustained by the vessel, in accordance to the U.S. laws and the manner complying with international laws, the owner of the vessel will be compensated as long as neither the vessel nor the crew have been involved in illicit action. Correct. Signed, Lawrence K. Ellis, Lieutenant Commander, U.S. Coast Guard Attaché. He's the attaché at the American Embassy, Embassy of the United States, Quito, Ecuador. It's a big city. Correct. The issue in this case is whether the United States has waived subject matter jurisdiction, has waived sovereign immunity. Well, there's more to it than that. We want to be proud of our United States government. Well, I understand that. They waived it because they said they'd pay it. They said they'd pay it subject to U.S. law. Oh, come on. Are we con artists? Is that what we are? You know, here, Lawrence K. Ellis, Lieutenant Commander, U.S. Coast Guard Attaché, right from the Embassy of the United States, Quito. You know what I think we should do? I think we should send you to mediation, and the government should live up to its obligations. Are you willing to go to mediation? That's not something that is within my authority to determine, Your Honor. Well, all I can say is we're going to do everything we can to make the government fess up. Well, Where are you from? Originally? No. Now. Right now I'm in San Francisco. San Francisco. I've been there for 10 years. I was in Washington, D.C. for the previous 25. In answer to Judge Fletcher's question, who would have authority to mediate on behalf of the United States in this case? Oh, I didn't think that was the question. I thought the question was whether the United States would be. Yes, that was. I'm asking a follow-up question. Since you said you don't have authority, who does? Well, if the follow-up question is, I suppose it would be me, the previous question is who would decide whether a mediation would occur as far as the United States is concerned. All right. That's what I'm following up on. I don't know the answer to that question. It would not be me. But if an actual mediation occurred, I assume it would be me. And I would like to address, regardless of the Court's obvious position on the letter from Commander Ellis. Wasn't that the letter? Tell these people we're hauling you in, and if there's any loss, we'll take care of it. And they got permission because it's flying, an Ecuadorian flight. They got permission from the Ecuadorian government. Otherwise, we boarded it. It could be an act of war, I suppose. They got permission before boarding from the Ecuadorian government and after being told that it was indeed a vessel registered under the flag of Ecuador, they did a limited search as full as they could at sea. They then contacted the Ecuadorian government and asked them what they wanted to do. The Ecuadorian government said bring it to the 12-mile limit, which is what they claim is their territorial sea. Turn it over to us. We'll bring it in. We'll search it some more, which they did. And nothing was found. We don't know. No, I believe nothing was found. I believe nothing was found. I don't know the extent of the Ecuadorian search, but a problem with the original search was, which was non-destructive, the borescope that they would normally put into the fuel tanks to see if they indeed had fuel. It was blocked about six inches down into the fuel by a blue object.  So it was brought in, turned over to the Ecuadorians at the 12-mile limit, and then the Ecuadorians searched the vessel and, I believe, the crew after they got to Porto. We do this all the time, don't we? Do what all the time? We stop Ecuadorian ships and other ships. We do drug and addiction tests. Sure, we do that. We do that. I've got a case on that. We do that. It took me a long time to put together. We do that. So we need the cooperation of the Ecuadorian government. We do. And we have the cooperation of the Ecuadorian government. And if I may, just for a moment, return to the issue of reciprocity. If there is any subject matter jurisdiction in this case, I think it's fairly clear it has to come from the Public Vessels Act. How the issue of reciprocity... Let me restate that. How discovery would assist plaintiffs on the issue of Ecuadorian law. Discovery from the United States is beyond me. Plaintiffs had every opportunity, if the Ecuadorians were willing, to get declarations from Ecuadorian government officials as to what their law is. Can a foreigner sue the government of Ecuador for damages allegedly caused by Ecuadorian Navy outside of their country? It would have been very easy to do that, but they didn't. We have an unsworn letter saying exactly what Your Honor said. Do you know the answer to that question? The reciprocity question on the merits? I know it's not in the record. No, I certainly don't. There is no case, I believe, which has addressed substantively the merits of Ecuadorian law. The cases we cited, Blanco and Estanifu, I think, was Honduran law and Greek law. Didn't the district court have an obligation on its own to figure out what that law is, since that's a question primarily of law? I don't believe so. I'm sure it's plaintiff's burden to provide. What cite for that? It's the plaintiff's burden to demonstrate a proposition of law. No, no, it's under the Public Vessels Act. It is plaintiff's burden to show to the satisfaction of the court in which the case is brought, which is the district court, to the satisfaction of that court, that the reciprocity provision has been satisfied. And to do that is a plaintiff's burden to come in with evidence, showing what the law of Ecuador is and showing that it's the same as the U.S. Well, is that a factual question or a legal question? The reason that's important is if it's a factual showing, then your argument has some force. But if it's a question of law, then the court is under an independent obligation to determine what the law is, regardless of whether the parties cite the right cases or the right information. It's a legal question as to who has the burden to show. No, no. The question I'm asking you is whether it's a legal question as to the content of Ecuadorian law. Well, it shouldn't be. What I was about to say is who has the burden is a legal question. What the law is should be a factual question. People come in and say this is what the law is, not what the law should be, not what we'd like it to be. This is what the law is, and here are cases or here are local rules or here are affidavits that show this very type of case has occurred in the past or here is the Constitution and show that you can do this. Well, if you're looking for a question of what is American law or what is Georgia law or what is Nebraska law on a certain topic, it's clearly not a question of fact. It may be difficult for the court in another place to figure it out, but it's not a question of fact. So why is this a question of fact? Is it or is it not a fact that Ecuador allows X type of lawsuit? Well, you can call it that. You can say is it or is it not a fact that the Public Vessels Act applies, but that's a legal question. That's a legal question. So I'm just adding the word fact. It's a legal question. Don't waste any more time on this. I mean, you know, you stand up there so arrogantly. I've never seen a U.S. attorney. Well, I have. Well, I'm not a U.S. attorney, Your Honor. Where are you? I'm in the Civil Division of the Department of Justice. We're not related to the U.S. attorney. We're in the Admiralty and Aviation Section. We only do admiralty cases, and others in the office do aviation cases. So you're from San Francisco? I have been in San Francisco the last 10 years. The previous 25, I was in the D.C. office. So what do you do? You handle admiralty cases? I handle only admiralty cases. Many of them have to do with waivers of sovereign immunity under the Seats of Admiralty Act. But you have cases like this where a lieutenant commander in an American embassy writes a letter, says if you suffer a loss, we'll pay you. Have I had a case like this? Yes. With these facts? No. I've never had a case that had any letter whatsoever. I've never had a case like this. Tell me why this isn't a waiver. Well, you've got the ambassador. Well, it certainly isn't a waiver of sovereign immunity. There's no case that says it's a waiver of sovereign immunity. He's saying we owe you the money. So he says we owe you the money, and we say, ha, ha, ha, we don't have to pay you. He's not Congress. Huh? He's not Congress, and I apologize if it sounds arrogant, but there are requirements for who and when sovereign immunity can be waived. It has to be waived. So you think, let me ask you, you think that the American embassy there is doing a con job on these people? No, I don't. You just think they're stupid, is that it? Who? The people at the American embassy. No. I think the letter says we will pay according to U.S. law, and if U.S. law isn't U.S. law, what we're determining here, whether there's jurisdiction against the United States. Okay. I mean, I didn't write the letter. No. I understand that it would have been better if either it said, I'll check with somebody, you know, about what we can do, or something else. We've got the letter we have. I thought we were arguing about subject matter jurisdiction because this is a case in the district court and now in the court of appeals, and you must have a waiver, and where is it? Well, there is a question about this letter in the sense that it is not written to the individuals who are plaintiffs here. It's written to the Ecuadorian government. Obviously, and there's no indication that it's third-party beneficiaries. But that's a contract issue, and I didn't write the letter. Well, there's also a question, I suppose, of sort of whether this is a political question between the governments. But if you were to be ordered to mediation, that might be something that you would. I'm sorry. If the court were to order mediation, that is something that might have to be explored further on your end of things. Well, obviously, whatever the court orders will be explored further. I think the issue of discovery in this case is a red herring. I think, as the district court said, and this panel can see what time the magistrate and the district court spent on discovery. There are at least three hearings. There are two decisions. They asked plaintiff's counsel what discovery he wanted, and they responded to it. But they didn't think it would have anything to do with the issues of subject matter jurisdiction. It's an abuse of discretion standard, and I don't see that there is a basis for reversing that. I'm not going to stand up here and jump up and down and say, gee, what a swell letter that was from the embassy. But I think the issue we have is subject matter jurisdiction. We're in court. You can't sue the United States unless there's a waiver of immunity, and we are fairly certain there is no waiver of immunity here. That may go to the issue of whether the court can order mediation unless they deny or find a waiver of immunity and say, hey, plaintiffs have followed the law. There's immunity. Let's say plaintiff is right and there's immunity under the headquarters theory under the tort claims act under SOSA. None of those is correct, but plaintiff keeps arguing it, saying the headquarters theory is still alive. It's not under SOSA. But my point is if there's no subject matter jurisdiction, the case is over. If there's a waiver of subject of sovereign immunity, then the case continues. And if the court would like to hear on any other issue, I was prepared to discuss quite a few, but I have a feeling that you may not. I don't have any further questions. Do you have further questions? Anchors away. Thank you. To be honest, I only have a couple of follow-up comments. Read SOSA carefully. SOSA addresses foreign claims. SOSA does not address claims on the open sea. I don't know if SOSA excludes headquarters claim. So if you look carefully at it, I don't know. But more important than that, I think the court is focusing on exactly what my problem was from the get-go in this case and kind of how do we get there from here. And your comment on if perhaps the fishermen third-party beneficiaries, and they very well may be. Once again, if you give me the opportunity to do some discovery, I can answer almost all of the questions. Well, it's not really a matter of discovery. The letter is not written to your clients. The letter was written from one government to another government. And, you know, nobody has pointed us to any cases that would allow this to be done other than through political channels, that is that the promise of our government to another government can be enforced by an individual. I haven't seen those cases here. Maybe they exist. But it was not a promise to your clients. Well, this is interesting. Once again, Mr. Blase gives you a whole bunch of facts in this case. You know, this happened, this happened, this happened. I would have loved to have asked some of these people these questions. I never got the opportunity to ask them in the deposition. Had we been able to do that, we could have found out a lot of these questions. But there's nothing. I guess I don't understand still what discovery would get you. The letter is not written to your clients. Let me give you an example. There is in the record a videotape of an admiral from the Ecuadorian Navy at the scene in Manta saying we will pay these people. That's what he's saying. If they didn't do anything wrong, they will be paid. That was the understanding of the Ecuadorian government. Now, interesting, Commander Tobar, the named plaintiff, was appointed the naval attache of Ecuador to the United States. So this is almost a government official. He was pulled from his job because of the allegations of drugs, which, of course, didn't turn out to be correct. But these were the things that had we had the opportunity to get some facts in this case, we might have been able to at least establish what the rules were. What were we playing with? I don't even know what the field looked like here. I can't tell you because nobody gave me. All I got was affidavits from the guy. Interesting, Commander Ellis, interesting. Commander Ellis signs an affidavit. Doesn't address one time in his affidavit his signature on the letter saying we would indemnify you or your fishermen for their lost tuna. Never one time. Never one time. So all I wanted to do was say to this guy, can you at least tell me who authorized this? What was it? How was it done? What was the arrangements between? How were these claims paid? Were they paid? Which would have helped me immeasurably on the sovereign immunity side, which my position was once you have this agreement, I think it's sovereign immunity's there. And it's, excuse me, sovereign immunity's gone and jurisdiction's there. Now, finally, and I'll get out of here for you, but did I have any trouble with mediation? No, I don't have any trouble with mediation. I think it's a very good idea. And having been litigating against the United States for 35 years since I got out of the Army, I will tell you this. It is not a hard decision for them to go to mediation at the appellate level. I have been with the government at mediation at the appellate level. So it's really not anything that's hard to do. It's just something you all can work. The attache, the officer, what was the name of that? Ellis. What? Ellis. Not Ellis, the Ecuadorian officer. Oh, no, you know, I forgot his name. He's in the record. Yeah, but you just mentioned it. Yes, I forgot his name. He's there in his white uniform. Now, is he still with the diplomatic corps? He was, I think he was the guy in charge of the port. Can I interrupt? Yeah. Mr. Boyaku was talking about his client, Mr. Tobar, who was in line, according to plaintiffs, to become the naval attache in Washington. The person who was giving the interviews is a wholly different person. Yeah, okay, but how about the guy who was going to be the Ecuadorian attache in Washington? He's the plaintiff, yes. That's Mr. Tobar. Oh, he's the plaintiff. Yeah. That's Mr. Tobar. They ruined this guy. Absolutely ruined him. That's enough. Thank you. Thank you very much. Well, the next place to go is 60 minutes. Something's thinking. Okay, we're adjourned. All right, so, we'll, that'll conclude this session, and we'll recess till? Eight o'clock. Eight o'clock, and we're all moving. Thank you very much. Thank you. No worries. Score's adjourned. I'd be happy to take you. No, no, it's fine. Thank you. Yeah, I didn't hide it because I appreciate it. I noticed that. Yeah. You want to do what? I don't know what I'm going to do.
judges: Fletcher B. , Pregerson, Graber